Jesús María Rossy, demandante y apelado, *v.* Rafael del Valle Zeno, demandado y apelante.

No. 3849.—*Visto:* Abril 21, 1927.   *Resuelto:* Julio 28, 1927.

1. ARRENDADOR Y ARRENDATARIO—ACCIÓN PARA VOLVER A ENTRAR EN, Y RECOBRAR POSESIÓN POR EL PROPIETARIO—DESAHUCIO—PROCEDIMIENTOS EN GENERAL—DEFENSAS—MODIFICACIÓN DEL CONTRATO.—Entablada acción de desahucio por quebrantamiento de un contrato de arriendo, *se resolvió:* que si bien el arrendador toleró la violación por el arrendatario de la cláusula 6ª. del contrato de arrendamiento en cuanto por ella se obligaba éste a entregar los boletos o comprobantes de conduce a que la misma se refiere, tal tolerancia no equivalía a una modificación del contrato mencionado.

2. ARRENDADOR Y ARRENDATARIO—ARRENDAMIENTOS Y CONVENIOS EN GENERAL—
   REQUISITOS Y VALIDEZ—INTERPRETACIÓN Y EFECTO *(Operation)*—INTERPRE-
   TACIÓN DEL CONTRATO POR LAS PARTES CONTRATANTES.—En este caso se
   otorgó un contrato, de arrendamiento—de derecho de cantera—el 1°. de ju-
   nio de 1922, estipulándose que el canon se pagaría cada mes, debiendo ve-
   rificarse dentro de los primeros cinco días del siguiente mes de la extracción
   de piedra, y empezando a contarse desde la fecha de dicho otorgamiento.
   *Se resolvió:* que la conducta de los propios contratantes, la rendición de
   informes mensuales por el arrendatario al arrendador y los pagos hechos
   por aquél a, y la aceptación uniforme de ellos por éste, indican que dichos
   contratantes tuvieron en mente el mes del calendario a los efectos del pago
   y que éste debía hacerse dentro de los primeros cinco días del mes del ca-
   lendario siguiente a aquél en que se firmó dicho contrato.
3. ARRENDADOR Y ARRENDATARIO—ACCIÓN DE VOLVER A ENTRAR EN, Y RECOBRAR
   LA POSESIÓN POR EL PROPIETARIO—DESAHUCIO—DERECHO DE ACCIÓN.—Cuando
   el arrendatario, por los términos del contrato de arrendamiento, viene obli-
   gado a pagar el canon de arrendamiento dentro de los primeros cinco días
   de cada mes y, solicitado el pago en tiempo por el arrendador, aquél no se
   verifica hasta dos días después, tal falta de pago da causa legal al juicio
   de desahucio.
4. ARRENDADOR Y ARRENDATARIO—ACCIÓN DE VOLVER A ENTRAR EN, Y RECOBRAR
   LA POSESIÓN POR EL PROPIETARIO—DESAHUCIO—PROCEDIMIENTOS EN GENERAL
   —EVIDENCIA—SU SUFICIENCIA—EN GENERAL.—En un caso de desahucio, la
   prueba de la falta de pago de los cánones de arrendamiento dentro del tér-
   mino estipulado en el contrato, debe ser clara y terminante.
5. ARRENDADOR Y ARRENDATARIO—ACCIÓN DE VOLVER A ENTRAR EN, Y RECOBRAR
   LA POSESIÓN POR EL PROPIETARIO—DESAHUCIO—PROCEDIMIENTOS EN GENERAL
   —DERECHO DE ACCIÓN—NOTIFICACIÓN DEL EJERCICIO DE LA ACCIÓN—CASO DE
   INCUMPLIMIENTO DEL CONTRATO.—Aún cuando el arrendador tolere en algunas
   ocasiones el quebrantamiento, por el arrendatario, del contrato de arriendo
   en cuanto a la fecha dentro de la cual éste viene obligado a verificar el pago
   de los cánones estipulados, el primero no está obligado a notificar al segundo,
   al tiempo del requerimiento de pago del canon, el que de dejar de satisfacer
   tal requerimiento provocaría inmediatamente un pleito para recobrar la po-
   sesión de la propiedad arrendada.

SENTENCIA de *Pablo Berga,* J. (San Juan), declarando con lugar la
demanda, con costas. *Confirmada.*

*M. Rodríguez Serra, J. H. Brown* y *J. Martínez Dávila,* abogados
del apelante; *Luis Llorens Torres, J. Ma. Rossy* y *Acuña & Ja-
ner,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del
tribunal.

La historia anterior de este caso puede hallarse en el de
*Rossy* v. *Del Valle,* 34 D.P.R. 726 y en el de *Del Valle, peti-
cionario,* resuelto en agosto 5 de 1926 por la Corte de Cir-
cuito de Apelaciones para el Primer Circuito.

El apelante insiste en que la corte inferior cometió error:

"1. Al estimar que, según el contrato entre las partes, el demandado dejó de entregar diariamente un boleto o comprobante de conduce por cada truck de piedra que saliera de la finca objeto del contrato.

"2. Al declarar que el demandado faltó al cumplimiento de sus obligaciones, según el contrato, en relación con la entrega de los boletos o comprobantes de conduce en los momentos de salir el truck de la finca.

"3. Al sostener que el demandado no pagó del canon del arrendamiento correspondiente al mes de junio de 1925, la suma de $51.42; de acuerdo con las cartas-órdenes que aceptó, expedidas por el demandante a favor de Sánchez Morales & Co."

[1] Estamos muy de acuerdo con el apelante en que la tercera cuestión aquí planteada ha sido establecida definitivamente por la Corte de Circuito de Apelaciones en el caso de *Del Valle, Peticionario, supra.*

El caso fué sometido en la corte inferior por la transcripción de la evidencia y fué resuelto por un juez que no presidió el acto del juicio. De la relación del caso y opinión en que se basó la decisión a que así se llegó tomamos el siguiente extracto:

"La prueba del demandante, en cuanto a la primera causa de acción, tiende a demostrar que el demandado, ni su encargado, cumplió con el contrato entregando los conduces o boletas por cada truck cargado de piedra que salía de la finca, al encargado del demandante dándose siempre disculpas por esa falta; que sólo se entregaban, en algunas ocasiones, resúmenes semanales y mensuales de la piedra extraída; y que el demandado manifestó en cierta ocasión al demandante que era mucho trabajo dar los conduces todos los días. Y la prueba del demandado tiende a demostrar que diariamente se sacaba piedra de la cantera y se conducía en trucks, haciéndose por cada truck un conduce en triplicado; uno para el cliente, a quien se vendía la piedra; otro como comprobante, que firmaba el cliente, y el otro que quedaba en poder del encargado del demandado en la finca, y del cual éste sacaba una copia, según manifestaciones de Pelegrín Nevares, que entregaba todas las tardes a Félix Zavala, encargado del demandante, unas veces personal-

mente y otras a su esposa; y que en agosto 1, 1924, habiéndose negado el encargado del demandante a recibirlos, se remitieron a éste
con carta de agosto 8, 1924 la nota del mes pasado (julio) y los
conduces del 1 al 7 de dicho mes de agosto.

"La prueba es contradictoria en cuanto a la entrega de los conduces, pero tomada en conjunto, ya que no hemos tenido la oportunidad de considerar el testimonio de los testigos por su manera
de declarar, se desprende que el demandado no ha entregado los
conduces o boletas por cada truck de piedra que salía de la finca,
sino copias de los conduces o boletas de los trucks que durante el
día salían de la finca, y con ello, claramente, no quedaba cumplido
el contrato que le obligaba a entregar al encargado del demandante,
para que éste llevara nota, diaria, un conduce o boleta *por cada
truck que saliera de la finca,* esto es, en los momentos de salir el
truck.''

La conclusión específica sobre este punto, sin embargo,
después de una discusión de la prueba relacionada con otras
cuestiones envueltas, no está tan cuidadosamente calificada.
Es como sigue:

"(a) Que el demandado ha dejado incumplida su obligación de
entregar diariamente un conduce o boleta por cada truck de piedra
que ha salido de la finca del demandante.''

La mayoría de los jueces de esta corte está perfectamente convencida no sólo de la corrección de la interpretación dada al contrato por la corte inferior, sino también de
la falsedad de las declaraciones tendentes a probar la entrega diaria de comprobantes, de conformidad con la interpretación que sostiene el apelante. Hay mucho que decir
en apoyo de este punto de vista, lo cual podría ser mucho
mejor expresado por cualquier miembro de la mayoría que
el que suscribe, quien no cree que sea necesario determinar
finalmente, ninguna de estas cuestiones para resolver la
presente apelación, y quien no considera la doctrina del
caso de *Del Toro* v. *The Juncos Central Co.,* 276 Fed. 894,
como terminante sobre la cuestión de renuncia envuelta en
este aspecto del presente caso.

El contrato de arrendamiento contiene una cláusula que lee como sigue:

"Sexta: Para determinar el número de metros cúbicos de piedra, utilización mensualmente por el señor del Valle Zeno para la venta, se observará la regla siguiente: el encargado del señor Rossy llevará nota diaria de la piedra que se utilice para la venta de acuerdo con los comprobantes de 'conduce' o boletas que por cada truck u otro vehículo que salga de la finca le entregará el encargado del señor del Valle Zeno. Estos 'comprobantes de conduce,' o boletas expresarán el nombre del chauffeur, el número de metros cúbicos de piedra, la fecha en que la conducción se verifica e irán firmados por el señor del Valle Zeno o por su encargado. Cuando los trucks conduzcan piedra pulverizada ensacada (carbonato calizo), cada tonelada y media de polvo se computará por un metro cúbico de piedra el total de metros cúbicos que expresen los 'comprobantes de conduce,' o boletas durante un mes será pagado por el señor del Valle Zeno al señor Rossy dentro de los cinco primeros días del siguiente mes, de acuerdo con la cláusula quinta, en la forma que queda establecido.''

El arrendamiento se pagaría a una tarifa específica por metro cúbico de piedra sacada de la propiedad arrendada, y del Valle, según sus propias manifestaciones, fué quien redactó la cláusula en cuestión, por tener más experiencia en la administración y operación de canteras.

El propósito expreso de esta cláusula era proporcionar un método para determinar el número de metros cúbicos de piedra sacada mensualmente por del Valle. El agente de Rossy, no el mayordomo de del Valle, era quien debía llevar la cuenta diaria. Esa cuenta o nota de la cantidad y clase de piedra extraída era la que debía llevarse de conformidad con los comprobantes o boletos "que por cada *truck* u otro vehículo que saliera de la finca" tenía que entregar el mayordomo de del Valle. Evidentemente, la entrega de tales boletos o comprabantes a un empleado de Rossy fechados y firmados por del Valle o el mayordomo a cargo de la cantera, y especificando el nombre del *chauffeur* y el número de metros cúbicos de piedra por él trans-

portada, no fué propuesta con el fin de permitir que del Valle o su mayordomo llevaran una cuenta de la cantidad de piedra sacada, sino necesaria y exclusivamente para protección y beneficio del arrendador. Además, cada tonelada y media de piedra pulverizada tenía que contarse como un metro cúbico de piedra; y si se le privaba a Rossy de la oportunidad de inspeccionar cada *truck* cargado de piedra en el momento de salir de la finca, entonces no hubiera tenido ningún otro medio para cerciorarse del número de toneladas de piedra pulverizada que en realidad se extrajera. Evidentemente, la entrega al final de cada día de los comprobantes o boletos que abarcaban toda la piedra extraída durante ese día, implicaría el que del Valle o su mayordomo llevaran una cuenta diaria para Rossy así como para ellos mismos, y relevaría al agente designado para este fin por el arrendador de todo cuidado o responsabilidad a este respecto, a menos que éste no fuera lo suficientemente competente para llevar una nota exacta e independiente sobre la clase y cantidad de piedra contenida en cada *truck* al dejar la cantera, así como sobre el número de cargas sacadas, para no hacer mención del aumento del tiempo y del inconveniente que la substitución de tal sistema requiere.

El principal argumento señalado por el apelante en contra de la interpretación dada al contrato por la corte inferior se basa en la impracticabilidad supuesta de hacer una entrega por separado de cada boleto o comprobante al tiempo de la salida. El apelante asume que el cumplimiento substancial con los términos del contrato tal como lo interpretó la corte inferior hubiera requerido la presencia del mayordomo de del Valle, así como la del representante de Rossy en persona en cada ocasión del momento de la entrega. Con relación a esto, dicen los abogados:

"El propio demandante, hoy apelado, admite en su declaración que del Valle, reconocido por la otra parte como perito en el contrato, redactó esa cláusula sexta cuya interpretación no puede ser otra que la que su autor le ha dado.

"Y no puede ser otra, además de las razones expuestas, porque hubiera sido imposible en la práctica cumplir con una cláusula que exige que *con cada* truck que salga de la finca tenga el *mayordomo* que entregarle al *mayordomo de Rossy* un 'boleto,' si se tiene en cuenta que salían veinte y treinta trucks diàrios y hubiese sido necesario que el mayordomo de Rossy no hubiera hecho otra cosa que estar constituído en el portón de la salida recibiendo los 'boletos,' y el mayordomo de del Valle montado en *cada truck* que saliera de la finca para entregárselo, ya que la entrega *según contrato* es de mayordomo a mayordomo. Si en el momento de salir el truck el mayordomo de Rossy no estaba en el portón por haber ido a hacer alguna diligencia, todo el negocio de del Valle hubiera quedado paralizado . . .

"¡Conque entregándolos juntos en cantidad de uno *por cada* truck en la tarde, al terminar el trabajo, hubo alguna vez que la entrega tuvo que ser hecha a la señora del mayordomo Zabala porque éste estaba ausente en Juncos en una venta de cal de Rossy!"

Pero el contrato no especifica una entrega en persona hecha por del Valle o su mayordomo. Los comprobantes se hacían en triplicado llenándose ciertos blancos en una forma impresa. El *chauffeur* a cargo de cada *truck* llevaba comprobantes por duplicado, uno para el consignatario y el otro para ser firmado por él como recibo e informe para el mayordomo. Cada *truck* que salía de la cantera pasaba por la puerta de la casa que ocupaba el representante de Rossy. A falta de tal representante el *chauffeur* pudo haber dejado el boleto con la esposa u otro miembro de la familia, según se hizo en el caso de la entrega efectuada al terminar el día. Cualquier mujer o niño que hubieran sido llamados a la puerta habrían recibido el boleto e informado si el *truck* era pequeño o grande y si llevaba piedra triturada gruesa o piedra pulverizada en sacos. De todos modos, Rossy hubiera tenido pocos motivos para quejarse si del Valle hubiera adoptado esta práctica.

Rossy estipuló un canon mínimo de cien dólares mensuales, independientemente de la cantidad de piedra que se sacara, y no hay nada que demuestre que él esperaba recibir el promedio de una cantidad mucho mayor que ésa.

Es difícilmente razonable suponer que él tuvo en mente el hecho de que el pago se haría del dinero así recibido por un inspector competente, quien dedicaría todo su tiempo y atención a llevar una cuenta estricta sin la ayuda o cooperación de del Valle o su mayordomo. Sin embargo la interpretación que pretende el apelante que se le dé al contrato necesitaría la presencia continua de tal representante, bien en la cantera o en el portón por el cual pasarían los *trucks* al salir de la finca arrendada, a menos que el arrendador prefiriera dejar la contabilidad enteramente en manos de su arrendatario, y de ese modo abandonar cualquier beneficio o ventaja que pudiera haber derivado del cumplimiento de la sexta cláusula del contrato.

Fuera del conflicto de prueba en cuanto a la protesta que se dice haber sido hecha por Rossy y su agente en varias entrevistas con el mayordomo a cargo de la cantera y con del Valle, y fuera de un conflicto similar en cuanto a la entrega diaria de comprobantes al final de cada día, tal como alegan del Valle y su mayordomo y lo niegan Rossy y su representante, en realidad la rendición de los informes semanales y mensuales por el mayordomo es inconsistente con la teoría de la entrega diaria de boletos, por la sencilla razón de que en caso de tal entrega diaria, un informe semanal o mensual hubiera sido claramente superfluo. Todos estos informes, a excepción de uno solo, se titulan *"conduce"* y no se hace referencia alguna en ningún caso a una entrega anterior de boletos o comprobantes. La carta del mayordomo de fecha 8 de agosto de 1924, o sea, el día siguiente al en que se entabló el presente pleito, no sólo deja de hacer referencia a cualquiera de tales entregas diarias, o las que se intentaran hacer, sino que por clara implicación tiende de manera persuasiva a indicar una conclusión contraria. Lee como sigue:

"Estimado Don Jesús: Le remito la nota del mes pasado y los conduces del 1 al 7 de este mes, el otro día le fuí a dar el resumen a Félix y me dijo se lo entregase a Ud. y lo guardé esperando verle,

hoy le mando las notas de los 7 días de este mes y me dice lo mismo, él me había dicho los guardase y yo los tengo, si Ud. los necesita dígame desde cuándo él ha dejado de entregárselos, para sacárselos y mandárselos. Suyo Afmo. y S. S., (fdo) P. Nevárez.''

Por tanto, la mayoría resuelve que del Valle violó persistentemente la cláusula sexta del contrato de arrendamiento, que Rossy a lo sumo meramente toleró la delincuencia de del Valle a este respecto, y, aplicando por analogía la doctrina enunciada por la Corte de Circuito de Apelaciones en el caso de *Del Toro* v. *The Juncos Central Co., supra,* esa mera tolerancia por parte del arrendador no equivale a una modificación del contrato. El que suscribe, para los fines de esta opinión admite el quebrantamiento del contrato y el hecho de la protesta de Rossy en la forma y manera que él como testigo describió, pero no está preparado para decir, en ausencia de una objeción más definida y enérgica y después de una aquiescencia tan larga y continua en la substitución de los informes mensuales y la uniforme aceptación de tales liquidaciones, que del Valle no tuviera derecho de ser notificado de la intención de desahuciarlo inmediatamente por incumplimiento del contrato, en caso de que posteriormente dejara de entregar un boleto o comprobante por cada *truck* u otro vehículo cargado de piedra que saliera de la finca arrendada.

[2, 3] Sin embargo, los abogados también dicen que la corte inferior erró:

''4. Al decidir que el demandado estaba obligado a pagar el canon del mes de julio de 1924 dentro de los cinco primeros días del mes de agosto de 1924; y que la obligación de pagar ese canon venció dentro de los cinco primeros días del mes de agosto de 1924,''

''5. La corte también cometió error al estimar probado que el demandante pidió al demandado la liquidación de julio de 1924, y el cheque correspondiente a la misma, precisamente el día 5 de agosto siguiente, sin que se entregase ese día, ni se pusiese en el correo, lo que según la corte, dió causa legal al juicio de desahucio,'' y

"6. Al declarar con lugar la demanda y decretar el lanzamiento del demandado de la parcela.''

El apelante funda la cuarta proposición en el hecho de que el contrato de arrendamiento estaba fechado junio 1, 1922, y contiene una cláusula que lee como sigue:

"Quinta: El 'Derecho de Cantera' anteriormente dicho consistirá en el pago por el señor del Valle Zeno al señor Rossy de una determinada cantidad de dinero por cada metro cúbico de piedra utilizando para la venta por el primero, de acuerdo con la siguiente escala:

"a. Si la extracción fuere de cuatrocientos metros cúbicos durante cada mes o menos de esa cantidad, o aún cuando no hiciese extracción alguna, el señor del Valle Zeno pagará al señor Rossy la suma de cien dólares, por cada mes, verificándose este pago dentro de los cinco primeros días del siguiente mes de la extracción y empezando a contarse desde la fecha del otorgamiento de este contrato que firman ambos contratantes.

"b. Si la extracción se verificare por cantidad de cuatrocientos metros cúbicos en adelante, entonces el señor del Valle Zeno, además de los cientos dólares fijados en el párrafo anterior, letra A., pagará al señor Rossy la suma de diez centavos por cada metro cúbico de piedra que, en adición a los cuatrocientos metros fijados en el párrafo anterior, letra A, utilice el señor del Valle Zeno para la venta, verificándose también el pago dentro de los cinco primeros días del siguiente mes de la extracción y empezando a contarse desde la fecha del otorgamiento de este contrato, que firman ambos contratantes.

No se alega que las partes tuvieran en mente o quisieran especificar un mes lunar o un mes de treinta días, u otro período de tiempo que no fuera el mes del calendario Gregoriano; y una serie de pagos mensuales que se extendió por un período de dos o más años indica terminantemente que hubo el entendido por parte del apelante de que se tuvo en mente el mes del calendario.

La teoría del apelante parece ser que, a partir del día primero de junio de 1922, la fecha del contrato excluyendo dicho día, el próximo mes empezaría a contarse desde el segundo en vez del primer día, y que por tanto, "los cinco

primeros días expirarían el día 6 y no el 5 de los meses corrientes del calendario durante todo el tiempo del contrato.

La cláusula en cuestión fué redactada por del Valle, que no es ni notario ni abogado, sino ingeniero y agricultor. No hay evidencia intrínseca de que el notario ante quien se otorgó el documento lo revisara, y ninguna de las partes declaró que se hiciera enmienda o modificación alguna al borrador original.

El pensamiento que estuvo principalmente en las mentes de las partes no fué la fecha en que debían efectuarse los pagos mensuales, sino la fecha en que debía empezar a correr el tiempo que tales pagos abarcarían. Del Valle debía pagar cien dólares mensuales, independientemente de la cantidad de piedra sacada de la cantera. Pero el párrafo "A" no está redactada en esa forma. La primera mención que se hace con respecto al tiempo se relaciona con la cantidad de piedra que había de sacarse "por cada mes." El pago debería efectuarse por el mes durante el cual se extraía y transportaba de la finca arrendada la piedra, o que pudiera extraerse y transportarse. Si la cantidad de piedra sacada de la cantera y vendida excedía de determinada cantidad, del Valle tenía que pagar, además del tipo mínimo de cien dólares mensuales, diez centavos por cada metro cúbico en exceso. En todo caso, tales pagos debían efectuarse dentro de los primeros cinco días del mes siguiente al en que la piedra se sacara o transportara de la finca arrendada. La cuestión vital no era si el término de cada pago mensual expiraba el cinco o el seis del mes siguiente a aquel en que la piedra había sido sacada, sino más bien si el mes de junio debía ser incluído dentro del período cubierto por tales pagos. El mes de junio había empezado a transcurrir. Había que instalar maquinaria y que efectuar mucho trabajo preliminar antes de que realmente empezaran las operaciones. Del Valle declaró que durante los dos primeros meses del contrato no se sacó piedra alguna. Según se redactó el contrato, los pagos tenían que hacerse mensualmente, por

cada mes en que la cantera fuera explotada, ya se transportara y vendiera la piedra o no. Estos pagos debían efectuarse dentro de los primeros cinco días de cada mes siguiente a aquel en que se había sacado y vendido la piedra o que pudo haber sido sacada y vendida; y con el fin de disipar cualquier duda respecto al tiempo que el primero de dichos pagos debía cubrir, no el tiempo en que tales pagos debían efectuarse, se dispuso que el mes en que realmente empezarían las operaciones o el mes en que tales operaciones pudieran haber comenzado empezaría a contarse desde la fecha del otorgamiento del contrato.

El propósito era incluir el mes de junio, o por lo menos, disipar cualquier duda respecto a si debía considerarse o no que había sido incluído, no para disponer una superposición de los meses del calendario o para crear confusión en cuanto al claro ·significado de la disposición referente al pago durante los primeros cinco días del mes siguiente al en que la piedra había sido sacada o que pudo haber sido sacada. Y aquí tenemos también una interpretación práctica y de sentido común del contrato por la conducta de las partes contratantes y especialmente por la del apelante al rendir informes de liquidación mensuales así como los pagos hechos por del Valle y la aceptación uniforme de los mismos por Rossy desde la fecha del arrendamiento hasta el momento en que surgió la presente controversia.

Refiriéndonos a la prueba documental aducida por el demandado, hallamos lo siguiente: Una carta fechada septiembre 1, 1922, escrita ''en cumplimiento de la quinta cláusula del contrato ·de arrendamiento,'' conteniendo un informe de la cantidad de piedra sacada durante el anterior mes de agosto, e incluyendo un cheque por la suma adeudada de acuerdo con dicho informe; una carta similar de fecha octubre 1, 1922, respecto· a la piedra extraída durante el anterior mes de septiembre; una carta parecida de fecha noviembre 1, 1923, referente a la piedra sacada durante el anterior mes de octubre; una carta similar fechada di-

ciembre 1, 1923, relacionada con la piedra extraída durante
el anterior mes de octubre (*sic*); otra de fecha enero 1,
1923, respecto a la piedra sacada durante el anterior mes
de diciembre; otra de fecha febrero 1, 1923, referente a la
piedra extraída durante el anterior mes de enero; otra
carta de fecha marzo 1, 1923, con referencia a la piedra ex-
traída durante el anterior mes de febrero; otra de fecha
abril 1, 1923, con respecto a la piedra sacada durante el an-
terior mes de marzo; otra fechada mayo 1, 1923, dando la
cantidad de piedra sacada durante el anterior mes de abril;
otra carta fechada junio 1, 1923, relacionada con la piedra
extraída durante el anterior mes de mayo; otra de julio 1,
1923, respecto a la piedra sacada durante el anterior mes
de junio; otra de agosto 6, 1923, con respecto a la piedra
extraída durante el anterior mes de julio; otra de fecha 5
de septiembre de 1923 incluyendo un cheque por la piedra
sacada durante el anterior mes de agosto; otra de fecha
octubre 4, 1923, referente a la piedra extraída durante el
anterior mes de septiembre; otra de fecha 5 de noviembre,
1923, por la piedra extraída durante el anterior mes de oc-
tubre; otra fechada diciembre 5, 1923, relativa a la piedra
que se sacó durante el anterior mes de noviembre; otra
carta de fecha enero 5, 1924, por la piedra extraída durante
el anterior mes de diciembre; otra fechada febrero 5, 1924,
relacionada con la piedra sacada durante el anterior mes
de enero; otra de fecha 4 de marzo, 1924, referente a la
piedra extraída durante el anterior mes de febrero; y otra
de fecha 5 de mayo, 1924, relativa a la piedra extraída du-
rante el anterior mes de abril.

Y entre los documentos presentados por el demandante
hay un resumen de fecha 30 de junio, 1923, firmado por el
mayordomo del demandado, mostrando la cantidad de pie-
dra extraída durante dicho mes; un informe similar de fe-
cha julio 31, 1923, otro de julio 31, 1924; otro de 29 de fe-
brero, 1924 (sin firma); una carta de del Valle fechada
julio 3, 1924, conteniendo un informe en cuanto a la piedra

extraída durante el anterior mes de junio e incluyendo un cheque en pago de la misma; una comunicación parecida de fecha 5 de agosto de 1924 por la piedra extraída durante el anterior mes de julio.

Evidentemente, la contención de los abogados del apelante de que las palabras "dentro de los cinco primeros días del siguiente mes" deben interpretarse en el sentido de excluir el primero e incluir el sexto día del calendario gregoriano, es algo que se les ocurrió posteriormente y que ha surgido de la situación en que se colocó del Valle por haber dejado su tenedor de libros de preparar el informe corriente dentro de los primeros cinco días del mes de agosto de 1924 y la consiguiente inhabilidad de satisfacer el requerimiento de pago al tiempo de hacerse a las cinco de la tarde del cinco de dicho mes.

Pero aún de otro modo, el informe, aunque está fechado o antedatado agosto 5, no fué depositado en el correo hasta el 7 de agosto, 1924, por la tarde, y la cuestión de interpretación no puede afectar el resultado, a no ser sobre la teoría de una modificación de los términos y condiciones del contrato original y la consiguiente obligación de parte de Rossy de reiterar el requerimiento de pago el día 6 de agosto como justificación suficiente por la dilación del demandado en extender su cheque.

Ramón Gardón, agente y apoderado del demandado, declaró que los cheques a veces eran enviados por correo, pero que recientemente había recibido instrucciones de dejarlos en la oficina; que Rossy vendría por ellos; que Rossy venía en persona a buscarlos; que él venía el 4 o el 5 y a veces más tarde, mucho más tarde, según le pareciera, no para conveniencia del testigo, quien tenía los papeles listos para el cinco; que el testigo siempre tenía la liquidación terminada para el cinco; que Rossy no vino en busca de "este cheque" (el del cinco de agosto) sino que envió una persona que el testigo no conocía, a quien no se atrevió entregarle el informe y el cheque; que el testigo le mani-

festó al mensajero que el Sr. Rossy debía venir personalmente, pero que en vista de que no venía, el testigo, al día siguiente, envió el cheque por correo; que el mensajero no trajo carta alguna; que si hubiese presentado una carta, el testigo le habría entregado el cheque; que el testigo le dijo al mensajero que viniera por la tarde, y que éste no vino ni aquella tarde ni al día siguiente, y que en vista de eso el testigo mismo depositó el cheque en el correo; que uno o dos o tres meses antes de este incidente Rossy le había dicho al testigo que no le enviara la liquidación por correo, que él vendría personalmente por ella; que el testigo no recuerda cuándo fué que Rossy le dió esas instrucciones y que Rossy había ido en busca del cheque por varias ocasiones y no lo había encontrado porque estaba en el correo; que no recuerda si Rossy vino en busca de la liquidación en junio o julio pero sí recuerda que se le dió; que si Rossy no venía en busca de la liquidación dentro de dos días, le era enviada por correo; que no puede decir si fué en junio o julio que Rossy le dijo que no le enviara las liquidaciones por correo; que al principio las enviaba por correo y recientemente Rossy le dijo que no las enviara por correo, que él iría a buscarlas, y que el testigo hizo lo que se le ordenaba.

La declaración de del Valle es en parte al efecto de que después que se firmó el contrato empezó el desmonte de terraplenes, la instalación de maquinarias, bombas, ranchos, motores sobre bases de concreto, almacenes, vías, carros, herramientas y equipos, todo lo cual, incluyendo la compra de camiones, representaba una inversión de $30,000; que en realidad se empezó a trabajar como dos meses después; que el informe correspondiente al mes de julio (1924) fué preparado como de costumbre del primero al cinco de agosto, y que Gardón lo tenía listo, pero que un desconocido se personó en la oficina y dijo que Rossy lo había enviado en busca del cheque; que el testigo sabe lo que ocurre en su oficina; que no estaba presente, pero está enterado, que Rossy ha-

bía de venir en busca del cheque del primero al cinco y que
no lo hizo así; que el testigo se enteró en el resto del día
de la visita del mensajero; que el testigo le había dado ins-
trucciones en términos generales a Gardón y que práctica-
mente se había entendido que por varios meses Rossy ven-
dría a buscar los cheques, pero que como vivía en Trujillo
no le era conveniente venir a San Juan, y sucedió que cuando
vino por el cheque don Ramón le manifestó que había sido
remitido por correo, y él entonces dijo: "Don Ramón, no
me lo mande al correo, déjemelo aquí;" que se convino que
el cheque no sería enviado por correo; que el canon corres-
pondiente al primer mes se pagó por adelantado; que en
cierta ocasión Rossy manifestó que no podía cumplir es-
trictamente con los términos del contrato según el cual po-
día cobrar solamente del primero al cinco de cada mes; que
quería cobrar el arrendamiento antes de esa fecha en caso
de que estuviera necesitado de dinero, y que quedó conve-
nido que él podía cobrar no precisamente el último día o
el cinco, sino antes; que de acuerdo con el contrato original,
el canon de arrendamiento debía pagarse dentro de los pri-
meros cinco días del siguiente mes; que el testigo fué en-
terado por su empleado Gardón de que el mensajero había
venido en busca del cheque; que el cheque no le fué entre-
gado porque Gardón no conocía al mensajero; que constan-
temente llega gente a la oficina a comprar piedra: carpin-
teros desconocidos y albañiles conocidos sólo por el nombre
que dan después, y que entre los que van y vienen hubo un
individuo que dijo: "Manda a decir don Jesús que le mande
el cheque con la liquidación," y que su agente y apoderado le
contestó: "Que venga él más tarde a buscarlo"; que era la
primera vez en veinticinco meses que Rossy había enviado a
otra persona a cobrar, pues él siempre venía personalmente;
que esperaron que Rossy viniera y en vista de que no lo
hizo, se le remitió el cheque por correo al siguiente día, o
sea el día 7; que se retuvo el cheque en espera de que
Rossy viniera, como de costumbre, y que cuando no venía,

le era enviado por correo como de costumbre; que así había sido enviado en varias ocasiones; que cuando habían transcurrido dos o tres días y no se venía a procurar, se enviaba la carta por correo.

Las manifestaciones hechas por Rossy como testigo, en lo que a nosotros concierne, fueron al efecto de que los cánones de arrendamiento eran pagados a su vencimiento por cheque que se enviaba por correo; que el día 5 de agosto, el demandante estaba en San Juan en compañía del Sr. Nogueras en la calle, como a las cinco y media, frente a la puerta de la oficina del Sr. Muñoz Morales, y viendo que necesitaba dinero, le pidió a Nogueras que fuera a la oficina de del Valle y le dijera que le mandara el cheque y la liquidación del mes de julio; que Nogueras complació al demandante, trayendo entonces la contestación de que los mandarían dentro de tres o cuatro días, que habían estado ocupados; que el testigo esperó todo el día siguiente y hasta por la tarde del otro día, agosto 7, presentando entonces la demanda; que en la mañana del día 8 fué al correo en busca de su correspondencia y encontró una carta fechada agosto 5 con un incluso; que con anterioridad a la visita de Nogueras, el demandante no acostumbraba ir a la oficina de del Valle en busca del cheque; que iba en alguna ocasión personalmente, cuando tenía algún apuro de dinero, cuando el canon se había vencido, dentro del día en que debía cobrarse la obligación, pero que la forma ordinaria era el correo; y que el testigo no estaba obligado a ir a la oficina; que la costumbre era remitir el dinero por correo; que el testigo nunca le dijo a del Valle que no le enviara el dinero por correo; que siempre había ido a buscar los cheques durante los días 3, 4 ó 5, o sea, durante los primeros cinco días del mes; y que devolvió el cheque (el del cinco de agosto) porque estaba fuera de tiempo.

Francisco Nogueras, Juez Municipal de Lares· (*sic*) ocupó la silla testifical y dijo que el 5 de agosto como a las cinco de la tarde, a petición de Rossy, fué a la oficina de del

Valle y le dijo a Gardón que iba a nombre de Rossy a bus-
car el cheque y la liquidación del anterior mes de julio;
que Gardón llamó a un empleado y preguntó si la cuenta
de Rossy había sido enviada y el empleado contestó nega-
tivamente; que Gardón entonces le dijo: "La tengo y no
puedo darla, ha habido mucho trabajo en estos días, así
que por tanto se le mandará dentro de dos o tres días," que
el testigo comunicó esto a Rossy, y no llevaba carta alguna.

Tanto Rossy como del Valle tienen desde luego vivo in-
terés en el resultado de la presente controversia. La histo-
ria completa del caso así como la intensidad de sentimien-
tos, y la destreza de acción que se hacen tan conspicuas
durante el curso de este procedimiento, claramente tienden
a la conclusión de que las cantidades envueltas son mucho
mayores de las que aparecen de un examen ligero de las
alegaciones y de la prueba aducida en el juicio.

Rossy afirma enfáticamente que nunca le dijo a del Va-
lle que no enviara los cheques por correo, e incumbía al
demandado probar que hubo una modificación del contrato
escrito en lo que al tiempo se refería, o del convenio implí-
cito que surgió con motivo del silencio respecto al sitio del
pago, junto con la uniforme costumbre de efectuar los pa-
gos por correo. Rossy, del Valle y Gardón están contestes
en que las liquidaciones y los cheques mensuales fueron or-
dinariamente, si no uniformemente, remitidos por correo
durante un período que se extendió por más de año y me-
dio desde la fecha del otorgamiento del contrato. Del Valle
no dice que en la entrevista personal que tuvo con él, Rossy
le solicitara que retuviera los cheques en la oficina hasta
que se fueran a buscar; o, si hace uso de una expresión
que, considerada aisladamente y por sí sola sea susceptible
de tal interpretación, entonces la manifestación no es tan
clara y terminante que borre la impresión causada por la
inclinación general de su declaración. Esa declaración en
conjunto, en lo que con este extremo se relaciona, es una
mera repetición de lo que Gardón le había dicho, y como

tal apenas tiene peso alguno, bien considerada por sí sola o como tendente a corroborar la manifestación hecha por Gardón al ocupar la silla testifical. Y si se puede decir que lo manifestado por Gardón ha sido corroborado, entonces la declaración de Nogueras está igualmente sostenida, aunque no necesita de tanto refuerzo, por la declaración de Rossy. La mención que se hace de Trujillo Alto y del inconveniente de venir a San Juan en relación con la súplica de Rossy de que se abandonara la práctica de hacer los pagos por correo, y por clara implicación como el motivo de tal súplica, revela una desatención curiosa en cuanto a la exactitud de las manifestaciones sobre detalles que no inspira confianza. No hay ni pizca de prueba que demuestre que en ocasión alguna se prepararan las liquidaciones mensuales o que se firmaran los cheques mensuales o de que unos u otros hubiera que retenerlos en la cantera o en algún otro sitio en Trujillo Alto. Del mismo modo, la indicación de que le era más conveniente a Rossy visitar la oficina del demandado en San Juan que ir al correo de San Juan a donde se dirigían todas las cartas anteriormente mencionadas, debe hallar sostén en cualquier otro fundamento que el geográfico.

Igualmente poco satisfactoria es la explicación en cuanto a que el mensajero que fué en busca del cheque en agosto le era desconocido a Gardón. No se alega que el cheque fuera pagadero al portador o que pudiera haberse cobrado sin el endoso de Rossy, o de que el demandado hubiera sido responsable en caso de que el banco lo pagara en virtud de un endoso falsificado. No se indica razón alguna para impedir que se supiera la cantidad del cheque, el contenido de la liquidación o la existencia y naturaleza de ambos. Tanto del Valle como Gardón insisten en que el cheque y la liquidación estaban listos para ser entregados y en espera de la llegada de Rossy al tiempo del requerimiento. La única excusa o explicación que se da para justificar el que se dejara de satisfacer el requerimiento es el solo hecho de que

Gardón no conocía al mensajero. No se hizo esfuerzo alguno para identificar al portador de un mensaje que se decía haber sido enviado por Rossy. Una palabra indagatoria, sin más, hubiera revelado el hecho de que Rossy se hallaba a fácil alcance por medio de mensajero, si no por teléfono. Ni del Valle ni Gardón van tan lejos hasta decir que la general apariencia, el porte y la conducta del Juez Nogueras fueran tales que despertaran sospechas, o que estuviera disfrazado de carpintero, albañil o jornalero. Ni tampoco hay nada en la declaración de cualquiera de estos dos testigos que indique que no pudiera disponerse inmediatamente de un emisario más digno de confianza. De todos modos, si la verdadera razón para la negativa de entregar el cheque fué la que ahora se expone para ello, entonces es más que una desgracia para el demandado de que Gardón no le exigiera a Nogueras las credenciales al tiempo de la entrevista. Y, por no ofender a Nogueras, si Gardón se abstuvo de exponer la verdadera razón para su negativa, entonces una pequeña nota explicativa dirigida a Rossy y depositada en el correo, hubiera constituído igualmente un acto de cortesía y una prueba mucho más satisfactoria de buena fe.

Gardón no es meramente el empleado que tiene el interés corriente de un empleado en un caso en que se demanda a su patrono. Su posición es la de un agente y apoderado cuyo principal tiene en contingencia un contrato valioso la pérdida del cual puede atribuírsele directamente a la negativa de tal representante de satisfacer un requerimiento de pago, a menos que se pueda demostrar que la negativa en cuestión estaba justificada o por lo menos era excusable, por la forma y las circunstancias en que se hizo el requerimiento. La versión de Gardón de cómo y cuándo cayó en desuso inofensivo la práctica de enviar los cheques y las liquidaciones mensuales por correo, es aún más vaga e incierta que la de del Valle, no obstante el hecho de que la una pretende estar fundada en un conocimiento real, mientras que se admite que la otra es en substancia una reafir-

mación de hechos informados a del Valle por Gardón des-
pués de ese acontecimiento. Es cierto que Gardón es algo
más específico al determinar la época de la súplica de Rossy
a este particular como que se hizo dentro de un mes o dos
o tres antes del requerimiento de pago del cinco de agosto.
Pero no puede recordar cuándo fué que Rossy le dió estas
instrucciones. Asumiendo que le fueron dadas entre el pri-
mero y el cinco de mayo, entonces los cánones de mayo, ju-
nio y julio pagaderos en junio, julio y agosto eran los úni-
cos pagos que pudieron efectuarse de ese modo. Gardón
no recuerda si Rossy fué en busca de la liquidación y el
cheque bien en junio o en julio. Tampoco está seguro en
cuanto a si recibió o no las instrucciones de Rossy en junio
o julio. Ante tan positivas admisiones, el estrecho límite
de tiempo que Gardón se impuso a sí mismo y su manifiesta
inhabilidad para fijar bien las fechas o los hechos dentro
de ese límite, tienen muy poco peso las generalizaciones
más amplias que se encuentran en otras partes de su decla-
ración. Si Rossy fué en busca de su cheque bien en junio
o julio, o tanto en junio como en julio, o si uno o ambos
cheques firmados en junio y julio fueron retenidos por al-
gún tiempo y enviados más tarde por correo, no hay base
adecuada para tan arrasadoras manifestaciones como las de
que Rossy venía el cuatro o el cinco y algunas veces des-
pués, mucho después, según le conviniera, no para conve-
niencia de Gardón, quien siempre tenía los papeles listos
el cinco, y de que si Rossy no venía dentro de dos días en-
tonces se le enviaban por correo, o, como lo expresa del
Valle con mayor amplitud, que se retenía el cheque en es-
pera de que Rossy llegara, como él acostumbraba, y que
cuando no venía se le enviaba por correo como de costum-
bre; que así se había enviado en otras ocasiones; que
cuando habían transcurrido dos o tres días sin haberse ido
a buscar, la carta se remitía por correo.

Desde luego, no hay una incompatibilidad absoluta entre
cualquiera de estas afirmaciones y la aserción principal de

que Rossy le había dicho a Gardón que retuviera los cheques y las liquidaciones hasta que fuera por ellos y de que dejara de enviarlos por correo. Pero como hemos demostrado, la manifestación de Gardón prácticamente no ha sido corroborada, y él no sólo está controvertido de plano en cuanto a este extremo por Rossy, sino que lo está también por Nogueras en cuanto a otros extremos. Y si rechazamos la versión de Gardón sobre su entrevista con Nogueras, difícilmente podemos aceptar sin vacilación su manifestación en cuanto a las instrucciones que dice haber recibido de Rossy, pero que éste manifiesta que jamás dió. Además, repetimos que el peso de la prueba a este particular recaía sobre el demandado.

A excepción de un empleado del correo cuya declaración no tiene relación alguna con el punto que ahora estamos considerando, Nogueras es el testigo más desinteresado, si no el único, en el presente caso. Su declaración es breve e inequívoca. No tiene ninguno de los distintivos de la mentira. En la repregunta resultó que él no conocía a del Valle, que jamás había visitado la oficina de del Valle, y que no llevaba carta de presentación. No se hicieron más preguntas. El hecho de que Gardón no conociera a Nogueras no afecta su credibilidad como testigo, y no tenemos razón alguna para poner en duda su manifestación en cuanto a lo que Gardón dijo en la tarde del 5 de agosto.

De las conclusiones de hecho y de derecho a que llegó el juez de distrito tomamos el siguiente extracto:

"La forma de remitir las liquidaciones mensuales y hacer los pagos a ellas correspondientes, era por correo dentro de los cinco primeros días de cada mes. Y todas las cartas-liquidaciones, incluyendo cheques, dirigidos al demandante por el demandado y presentadas por éste como prueba, desde septiembre, 1922, a mayo, 1924, aparecen escritas en fechas de 1 a 5 del mes siguiente al de la extracción de la piedra con excepción de la carta de agosto, 1923, que lleva fecha del día 6. Pero esta tolerancia no alteró el contrato porque 'un contrato de arrendamiento no queda modificado para el futuro en lo que respecta a la fecha del pago fijado por el hecho

de que el arrendador acepte el pago correspondiente a algunos. de los plazos después de vencido el término.'' *Del Toro* vs. *The Juncos Central Co.,* 29 D.P.R. 231; 276 Fed. Rep. 894.

''El demandado debía reputarse deudor del canon mensual de $100, más 10 centavos por cada metro cúbico de piedra en adición de los 400 que se extrajeran y utilizaran para la venta, dentro de los cinco primeros días del mes siguiente, según los términos del contrato, y como el demandante pidió al demandado la liquidación de julio, 1924, y el cheque correspondiente a la misma, precisamente el día 5 de agosto siguiente, sin que se entregara la liquidación y verificase el pago y como tampoco se depositó en el correo en esa fecha, sino dos días después, dió causa legal al juicio de desahucio. *García* vs. *Fernández,* 8 D.P.R. 106.

''De todo lo expuesto, por el resultado de la evidencia, se concluye:

    \*     \*     \*     \*     \*     \*     \*

''(c) Que el canon correspondiente al mes de julio, 1924, tampoco fué pagado por el demandado a su vencimiento, o sea, dentro de los cinco primeros días del mes de agosto de 1924.''

No encontramos error en esto.

[4, 5] El apelante insiste en que Rossy le puso una trampa a su arrendatario y de que en vista de la naturaleza drástica del procedimiento sumario de desahucio, debe exigirse la presentación de prueba clara y convincente sobre la alegada falta de pago del canon.

Es verdad que Rossy no dió aviso alguno de su intención de aprovecharse de cualquier falta de cumplimiento del requerimiento de pago. También puede ser que se anticipaba la falta de preparación del agente y apoderado del Sr. del Valle para satisfacer un requerimiento hecho al terminar el día laborable 5 de agosto. Es por sí mismo evidente que la radicación de la demanda fué un rudo despertar para el demandado. Pero Rossy no tenía obligación legal alguna de notificar a del Valle al tiempo del requerimiento de pago de que el dejar de satisfacer tal requerimiento provocaría inmediatamente un pleito para recobrar la posesión de las propiedades arrendadas. Esa es una de las características drásticas de la ley a que se refieren los abogados.

Puede notarse de paso que si Rossy dice la verdad en cuanto a la alegada conducta arbitraria de del Valle en conexión con el cumplimiento de la obligación contractual referente a la entrega diaria de comprobantes o boletos (*tickets*) por cada camión cargado de piedra que se sacara, entonces, a decir lo menos, había circunstancias atenuantes. Pero, sea ello como fuere, es nuestro deber hacer cumplir la ley tal como la encontramos, no desecharla o interpretarla fuera de su texto, invitando, como resultado de esa actitud, la conclusión de que en esta jurisdicción "los casos opresivos tuercen la jurisprudencia." Otra miga de consuelo para aquellos que deploran el presente *status* de la ley puede hallarse en el gastado axioma, que, sin embargo, está consagrado por el tiempo, de que el cumplimiento estricto de una disposición legislativa poco deseable o poco satisfactoria, puede resultar ser el medio más efectivo para precipitar su derogación o enmienda.

Estamos muy de acuerdo con el apelante de que la prueba de falta de pago en un caso de desahucio debe ser clara y terminante. En este caso fué clara y terminante. El caso de *Vannina* v. *López,* 259 Fed. 198, a que hace mención el apelante sin citar el tomo ni la página, no es aplicable. Cualquier duda en cuanto a la necesidad de un requerimiento en el presente caso quedó disipada por el requerimiento de pago hecho en la tarde del día 5 de agosto de 1924. El tiempo para el pago expiraba en ese día, tanto por virtud de los términos del contrato escrito como por el convenio mutuo de las partes evidenciado por su continua conducta, la cual indica la clara comprensión y la interpretación contemporánea del documento original. Sin duda alguna, una carta conteniendo el cheque y la liquidación corrientes, depositada en el correo y dirigida como de costumbre, al igual que las comunicaciones anteriores, a "Jesús M. Rossy, San Juan, Puerto Rico," si así se hubiera dirigido y depositado antes de media noche del día 5 de agosto, hubiera relevado al demandado de cualquier responsabilidad poste-

rior con motivo de la larga práctica establecida en cuanto a este extremo. En tales circunstancias, no le hubiera sido permitido a Rossy que atacara por fundamentos técnicos la suficiencia de una oferta de pago así hecha. Su aceptación de cheques recibidos por él por correo en la oficina postal de San Juan durante dos o más años, los cuales iban incluídos en cartas fechadas, con una o dos excepciones, en o antes del quinto día de cada mes, equivalía, para todos los designios y fines prácticos, al nombramiento de un representante residente en San Juan a quien se le podía pagar el canon mensual a su vencimiento. En vista de esta costumbre establecida, no era necesario el requerimiento; ni mucho menos, después de la negativa de satisfacer el requerimiento hecho por Nogueras, acompañada de la manifestación de que se efectuaría el pago dentro de dos o tres días, estaba Rossy obligado a visitar personalmente la oficina de del Valle y permanecer en ella hasta media noche con el fin de proporcionar una oportunidad adecuada para el pago.

La declaración incontrovertida del empleado del correo antes referido estableció firmemente el hecho de que la carta y el cheque fechados agosto 5 fueron depositados en el correo de San Juan en la tarde del 7 de agosto. De ese modo se demostró más allá de la sombra de una duda y desde cualquier punto de vista posible, según el contrato original, que del Valle había incurrido en mora al tiempo de tal oferta de pago, y el peso de la prueba en ese sentido pasó entonces a los hombros del demandado. El esfuerzo del demandado de justificar esta dilación por la teoría de la súplica de Rossy de que se retuvieran los cheques y las liquidaciones mensuales en la oficina de del Valle hasta que se fueran a buscar, así como una disposición para llevar a efecto estas instrucciones, no satisfizo a la corte inferior, y por las razones anteriormente expuestas, no nos satisface, de que se hiciera jamás tal solicitud o de que Rossy diera tales instrucciones.

*Debe confirmarse la sentencia apelada.*